J-S51001-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.F.M., FATHER | : | No. 3249 EDA 2014 |

Appeal from the Order October 23, 2014
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-DP-0000669-2012

| | | |
|---|---|---|
| IN THE INTEREST OF: K.H.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.F.M., FATHER | : | No. 3250 EDA 2014 |

Appeal from the Order October 23, 2014
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-DP-0000675-2012

| | | |
|---|---|---|
| IN THE INTEREST OF: A.H.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.F.M., FATHER | : | No. 3251 EDA 2014 |

Appeal from the Order October 23, 2014
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-DP-0000676-2012

BEFORE:  GANTMAN, P.J., LAZARUS, J., and PLATT, J.*

MEMORANDUM BY GANTMAN, P.J.:             **FILED OCTOBER 02, 2015**

Appellant, A.F.M. ("Father") appeals from the orders entered in the Philadelphia County Court of Common Pleas, Family Court Division, which found aggravated circumstances existed and reasonable efforts were no longer required of the Department of Human Services ("DHS") to reunify

_____

*Retired Senior Judge assigned to the Superior Court.

Father and J.M., K.H.M., and A.H.M. ("Children").  We affirm in part and vacate in part.

The trial court fully set forth the relevant facts and procedural history of this case in its opinion filed March 24, 2015.  Therefore, we have no need to restate them at length; but we will summarize them briefly.  Most recently, since the spring of 2012, DHS has been involved with this family, based on reports of Father's excessive and inappropriate discipline toward Children and their failure to thrive.  Each child suffered varied expressions of Father's severe discipline and severe physical and emotional consequences as a result of his systematic starvation of Children.  Consequently, Children were placed under protective orders, followed by findings of dependency and commitment to DHS' custody.  The court initially permitted supervised visits with Father, except for J.M., whose visits with Father were suspended.  Throughout 2012, the court held regular permanency review hearings, after which the court continued Father's supervised visits with Children, except for J.M.  Visits with J.M. remained at the discretion of J.M.'s therapist.

The instant proceedings began with child advocate petitions, filed on February 5, 2013, for a finding of "aggravated circumstances" and child abuse against Father relative to all three children.  On November 13, 2013, the child advocate filed amended petitions for a finding of aggravated circumstances and child abuse against Mother as well.  The hearing on these petitions was scheduled and rescheduled throughout the end of 2013 and

into 2014, based on appointment of new counsel, court schedules, and/or counsel's schedules. The hearings eventually occurred on July 7, 2014, September 8, 2014, October 1, 2014, October 15, 2014, and October 23, 2014.[1] At the October 23, 2014 hearing, the court found "aggravated circumstances" existed as to Father relative to all three Children and allowed DHS to discontinue reasonable efforts to reunify Father and Children. The court suspended Father's visits with J.M. and K.H.M. The court scheduled a hearing for December 1, 2014, to continue the permanency testimony for A.H.M. and decide visitation issues regarding Father and A.H.M.[2] Meanwhile, Father timely filed notices of appeal from the court's October 23, 2014 orders on Monday November 24, 2014, accompanied by a concise statement of errors complained of on appeal per Pa.R.A.P. 1925(a)(2)(i).[3]

---

[1] At the start of the October 15, 2014 hearing, the child advocate withdrew the petition for aggravated circumstances/child abuse against Father regarding J.M. At the start of the October 23, 2014 hearing, the parties argued that, despite the child advocate's withdrawal of the petition for aggravated circumstances against Father regarding J.M., the court could still find aggravated circumstances as to J.M. if the court found aggravated circumstances against Father as to A.H.M. and/or K.H.M., because a finding as to one child applies to all other children. Father's counsel objected, stating a new motion must be filed against Father regarding J.M. on the basis of the sibling finding. The court overruled the objection.

[2] The permanency hearing for A.H.M. ultimately concluded on January 15, 2015. The court suspended Father's visits with A.H.M. until further notice. Father filed an appeal from that order, docketed at No. 624 EDA 2015. By order dated July 2, 2015, the appeal at No. 624 EDA 2015 was dismissed for failure to file a brief.

[3] Notwithstanding the initial appeal filing date, these consolidated appeals were not listed for disposition due to the delay in transmittal of the certified

- 3 -

On appeal, Father raises the following issues:

WAS FATHER DENIED A FAIR HEARING AND DUE PROCESS BY THE TRIAL COURT'S REFUSAL TO PERMIT FATHER TO TESTIFY?

DID THE [TRIAL] COURT ERR IN FINDING AGGRAVATED CIRCUMSTANCES AS TO J.M. AS THE CHILD ADVOCATE HAD WITHDRAWN [HER] PETITION AS SUCH THE COURT MADE A DECISION ON A CHILD IN WHICH THERE WAS NO PETITION BEFORE THE COURT?

DID THE [TRIAL] COURT ERR IN DETERMINING THAT AGGRAVATED CIRCUMSTANCES EXIST AGAINST FATHER AS DHS FAILED TO PROVE THE CIRCUMSTANCES BY "CLEAR AND CONVINCING EVIDENCE" THAT FATHER EITHER DIRECTLY OR BY NEGLECT CAUSED THE CHILD'S INJURIES AS REQUIRED BY 42 PA.C.S.A. § 6341(C.1) AND 42 PA.C.S.A. § 6302.

DID THE [TRIAL] COURT ERR IN DENYING FATHER VISITATION OF J.M. AND K.H.M.

(Father's Brief at 4).

The applicable scope and standard of review for dependency cases is as follows:

The standard of review which this Court employs in cases of dependency is broad. However, the scope of review is limited in a fundamental manner by our inability to nullify

---

record to this Court. The certified record was first due by December 24, 2014. On January 8, 2015, this Court contacted the trial court and repeatedly requested the certified record and the court's opinion. This Court finally received both the certified record and the opinion on March 26, 2015, causing the briefing schedule to be deferred by three months. Further Father sought another thirty days in extensions of time to file a brief. Appellees also sought and were granted short extensions of time to file briefs, which were all filed by June 29, 2015. *See In re T.S.M.*, 620 Pa. 602, 609 n.7, 71 A.3d 251, 255 n.7 (2013) (reproaching this Court for **unexplained** delays in disposition of cases involving at-risk children, causing them to remain in stasis for substantial, unnecessary time).

> the fact-finding of the lower court. We accord great weight to this function of the hearing judge because he is in the position to observe and rule upon the credibility of the witnesses and the parties who appear before him. Relying upon his unique posture, we will not overrule his findings if they are supported by competent evidence.

*In re A.H.*, 763 A.2d 873, 875 (Pa.Super. 2000) (citations omitted). *See also In re L.Z.*, ___ Pa. ___, ___, 111 A.3d 1164, 1174 (2015) (reiterating standard of review in dependency cases requires appellate court to accept trial court's findings of fact and credibility determinations if record supports them, but appellate court is not required to accept the trial court's inferences or conclusions of law); *In re D.P.*, 972 A.2d 1221, 1225 (Pa.Super. 2009), *appeal denied*, 601 Pa. 702, 973 A.2d 1007 (3009) (stating applicable standard of review in dependency cases is "abuse of discretion"). Further, in placement and custody cases involving dependent children:

> The trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witnesses and resolving any conflicts in the testimony. In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence. When the trial court's findings are supported by competent evidence of record, we will affirm even if the record could also support an opposite result.

*In re S.G.*, 922 A.2d 943, 947 (Pa.Super. 2007). The Pennsylvania Juvenile Act,[4] which was amended in 1998 to conform to the federal Adoption and Safe Families Act ("ASFA"),[5] controls issues pertaining to the custody and

---

[4] 42 Pa.C.S.A. §§ 6301-6365.

[5] 42 U.S.C. § 671 *et seq*.

- 5 -

placement of dependent children. *Id.* "The policy underlying these statutes is to prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment. Consistent with this underlying policy, the 1998 amendments to the Juvenile Act, as required by the ASFA, place the focus of dependency proceedings, including change of goal proceedings, on the child." *Id.* In other words, these Acts equally emphasize the best interests of the child is at the heart of the court proceedings; although the reunification of children placed in foster care with their natural parents is a primary goal, the ASFA "was designed to curb an inappropriate focus on protecting the rights of parents when there is a risk of subjecting children to long term foster care or returning them to abusive families." *In re C.B.*, 861 A.2d 287, 295 (Pa.Super. 2004).

> Both statutes are compatible pieces of legislation seeking to benefit the best interest of the child, not the parent. There is no denying that ASFA promotes the reunification of foster care children with their natural parents when feasible, but the one notable exception to the goal of reunification is where aggravated circumstances are extant in the home, which encompasses abandonment, torture, and/or abuse of a chronic or sexual nature:
>
>> (D)  reasonable efforts … shall not be required to be made with respect to a parent of a child if a court of competent jurisdiction has determined that—
>>
>>> (i) the parent has subjected the child to aggravated circumstances (as defined in State law, which definition may include but need not be limited to abandonment, torture, chronic abuse, and sexual abuse)[.]

42 U.S.C. § 671(a)(15)(D)(i). In like fashion, Pennsylvania's Juvenile Act focuses upon reunification of the family, which means that the unity of the family shall be preserved "whenever possible." 42 Pa.C.S.A. § 6301(b)(1). However, as with ASFA, all family reunification may cease in the presence of a finding of aggravated circumstances…:

> **(c.1) Aggravated circumstances.**—If the county agency or the child's attorney alleges the existence of aggravated circumstances and the court determines that the child is dependent, the court shall also determine if aggravated circumstances exist. If the court finds from clear and convincing evidence that aggravated circumstances exist, the court shall determine whether or not reasonable efforts to prevent or eliminate the need for removing the child from the home or to preserve and reunify the family shall be made or continue to be made and schedule a dispositional hearing as required by section [6351(e)(3)] (relating to disposition of dependent child).

42 Pa.C.S.A. § 6341(c.1).

*In re M.S.*, 980 A.2d 612, 615 (Pa.Super. 2009), *appeal denied*, 603 Pa. 710, 985 A.2d 220 (2009). "Safety, permanency, and the well-being of the child must take precedence over all other considerations, including the rights of the parents." *Id.*

Our Juvenile Act defines "Aggravated circumstances" as including the following circumstances:

**§ 6302. Definitions**

**"Aggravated circumstances."** Any of the following circumstances:

\* \* \*

(2) The child or another child of the parent has been the victim of physical abuse resulting in serious bodily injury, sexual violence or aggravated physical neglect by the parent.

42 Pa.C.S.A. § 6302(2). The definition of "child abuse" in effect at the time of these cases included:

**§ 6303.  Definitions**

**(b) Child abuse.—**

(iv) Serious physical neglect by a perpetrator constituting prolonged or repeated lack of supervision or the failure to provide essentials of life, including adequate medical care, which endangers a child's life or development or impairs the child's functioning.

23 Pa.C.S.A. § 6303(b)(iv). "Aggravated physical neglect" means "[a]ny omission in the care of the child which results in a life-threatening condition or seriously impairs the child's functioning." 42 Pa.C.S.A. § 6302. Section 6334 of the Juvenile Act addresses petitions alleging aggravated circumstances in pertinent part as follows:

**§ 6334.  Petition**

\*     \*     \*

**(b)  Aggravated circumstances—**

(1)  An allegation that aggravated circumstances exist may be brought:

(i) in a petition for dependency with regard to a child who is alleged to be a dependent child; or

(ii) in a petition for a permanency hearing with regard to a child who had been determined to be a

dependent child.

> (2)  The existence of aggravated circumstances may be alleged by the county agency or the child's attorney.
> …
>
> (3)  A petition for dependency or a permanency hearing that alleges aggravated circumstances shall include a statement of the facts the…child's attorney intends to prove to support the allegation.  …

42 Pa.C.S.A. § 6334(b).  Section 6351 of the Juvenile Act governs the disposition of the dependent child.  42 Pa.C.S.A. § 6351.

In dependency cases, the standard to measure visitation depends on the goal mandated in the family service plan.  **In re C.B.**, 861 A.2d 287, 293 (Pa.Super. 2004), *appeal denied*, 582 Pa. 692, 871 A.2d 187 (2005). "Where…reunification still remains the goal of the family service plan, visitation will not be denied or reduced unless it poses a grave threat.  If the goal is no longer reunification of the family, then visitation may be limited or denied if it is in the best interests of the…children." **Id.** (quoting **In re B.G.**, 774 A.2d 757, 760 (Pa.Super. 2001)).

> The "grave threat" standard is met when the evidence clearly shows that a parent is unfit to associate with his…children; the parent can then be denied the right to see them.  This standard is satisfied when the parent demonstrates a severe mental or moral deficiency that constitutes a grave threat to the child.

**In re C.B., supra** at 294 (internal citations and some quotation marks omitted).

Finally, "The general rule is that a court may, in its discretion, reopen

the case…for the taking of additional testimony, but such matters are peculiarly within the sound discretion of the trial court…." ***Colonna v. Colonna***, 791 A.2d 353, 356-57 (Pa.Super. 2001), *appeal denied*, 569 Pa. 690, 803 A.2d 732 (2002) (quoting ***In re J.E.F.***, 487 Pa. 455, 458, 409 A.2d 1166 (1979)).

> Such a ruling will be disturbed only if the court has abused its discretion.
>
> In determining whether there has been an abuse of discretion in denying a motion to reopen a case for further evidence, it is logical to review those factors which a court should consider when confronted with such a motion.
>
> This Court has previously found it proper to reopen a case to allow the introduction of additional evidence where the evidence has been omitted by accident, inadvertence, or even because of mistake as to its necessity…but not where the omission was intentional…. We have also stated that a case may be reopened where it is desirable that further testimony be taken in the interest of a more accurate adjudication…and where an honest purpose would be justly served without unfair disadvantage….

***Id.*** at 458-59, 409 A.2d at 1166 (internal citations omitted).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Joseph Fernandes, we conclude Father's issues merit no relief. The trial court opinion comprehensively discusses and properly disposes of the questions presented. (***See*** Trial Court Opinion, filed March 24, 2015, at 1-18) (finding: (1) Father testified at September 8, 2014 hearing; given scheduling and coordination difficulties, Father knew he had to testify at October 15,

2014 hearing, at specific time and date certain, but he intentionally left courthouse and did not return until 45 minutes after hearing was scheduled and after closing arguments; based on Father's September 8, 2014 testimony, Father's proposed additional testimony would have been cumulative; court had sufficient evidence to reach decision on aggravated circumstances; (2) court asks us to vacate its decision against Father on aggravated circumstances/no reasonable efforts regarding J.M., solely because child advocate withdrew that petition; (3) evidence was sufficient to support aggravated circumstances and child abuse against Father as to K.H.M. and A.H.M, based on Father's excessive discipline and systematic neglect of Children's basic caloric needs and resulting obvious health problems, which resolved following removal from home and normal diet; (4) based on competent, credible testimony, court continued suspension of Father's visitation with J.M. because his heinous and repugnant actions toward J.M. posed grave threat to health, safety, and welfare of J.M.; K.H.M.'s visits with Father have hindered her progress in therapy; K.H.M. is so afraid of Father that she cannot disclose her fears in therapy because she is afraid Father will kill her with gun if she shares what happens during visits with Father; K.H.M. needs to feel physically and emotionally safe so she can heal from trauma she suffered at Father's hand; Father posed grave threat to health, safety, and welfare of K.H.M.; based on competent, credible testimony, court suspended Father's visitation with K.H.M.).

With respect to Father's complaint about reopening the record, under the circumstances of this matter, we conclude the court properly found that the proposed additional evidence from Father would not have led to a more accurate adjudication and its absence had no problematic effect on the result. ***See In re J.E.F., supra***. Further, the record supports the court's decisions on aggravated circumstances against Father with respect to K.H.M., and A.H.M. The record also supports the court's findings as to J.M. Nevertheless, based solely on the child advocate's withdrawal of the petition for a finding of aggravated circumstances/child abuse regarding J.M., and in accord with the trial court's request, we vacate the court's finding of aggravated circumstances against Father as to J.M. only. We affirm the court's orders in all other respects, based on the trial court's opinion.

Orders affirmed in part and vacated in part. Jurisdiction is relinquished.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/2/2015

**IN THE COURT OF COMMON PLEAS**
**FOR THE COUNTY OF PHILADELPHIA**
**FAMILY COURT DIVISION**

RECEIVED

2015 MAR 24 PM 2: 57

PROPROTHY

In Re: A.H.M.   : CP-51-DP-0000676-2012
      K.H.M.   : CP-51-DP-0000675-2012
      J.M.     : CP-51-DP-0000669-2012

APPEAL OF: A.F.M., Father    : 3249, 3250, 3251 EDA 2014

**OPINION**

**Fernandes, J.:**

Appellant, A.F.M. ("Father"), appeals from the order entered on October 23, 2014, finding that aggravated circumstances existed and reasonable efforts need not be made by the Department of Human Services to reunify J.M. ("Child 1"), K.H.M. ("Child 2"), and A.H.M. ("Child 3") (collectively "Children") with their Father ("DHS") pursuant to 42 Pa.C.S. § 6302. Maureen F. Pie, Esquire, counsel for Father, filed a notice of appeal with a Statement of Errors Complained Of pursuant to Rule 1925 (b).

**Factual and Procedural Background**

In 2011, DHS received an allegation that Child 1, born on December    2005; Child 2, born on August 2009; and Child 3, born on April    2008, were underweight. As a consequence, DHS implemented a Rapid Service Response Initiative ("RSRI") that the family completed successfully. On April 18, 2012, Mother visited Dr. Nasira Majid's office. Dr. Majid found Child 2 with a distended stomach and without regular bowel movements, and instructed Mother to take Child 2 to the emergency room. A Child Protective Service ("CPS") report received by DHS on April 18, 2012, alleged that Mother took Children to St Christopher Hospital ("SCHC") and Child 2 was admitted into the hospital. The report also alleged that the three siblings were exclusively in Father's care from 9:00 am to 2:00 pm, that Father refused to provide food to the Children, that Father abused his family, and that Child 1 was home schooled and weighed twenty-two pounds.

On April 19, 2012, DHS learned that Child 3 was also admitted into SCHC due to failure to thrive. On the same date DHS spoke with Child 1. Child told DHS that she was fearful of her Father, that

she did not want to return to her family home, that Father used a belt on numerous occasions to hit her body, that she was forced to stand in a corner for long periods of time and that every morning she was not permitted to eat breakfast until she read 20 pages of a text. Child also mentioned that if her Mother put extra food in Children's plates, Father would discard the food. On April 19, 2012, Father told DHS that Children adhere to a vegetarian diet and received medical care in New York. Father also told the DHS investigative worker that he messed up. (N.T. 09/08/14, pg. 100). DHS also met with Dr. Ajayi at SCHC and learned the growth rate of the Children's heads were disproportionate to their bodies growth rate. Child 1 was never admitted to SCHC and was placed in the home of family friends of the Father. DHS also learned that Child 1 was truant and not enrolled in school. Child 2 and Child 3 remained in the hospital for further medical treatment until April 23, 2012.

On April 19, 2012, DHS received an Emergency General Protective Service reports ("EGPS"), which alleged that Father used excessive and inappropriate discipline with Child 3. The report alleged that Father forced Child 3 to jump up and down near a wall with his hands in the air; that Father would not allow Child 3 to stop jumping; and that this had continued for an unknown period of time. The report also alleged that Father frequently left Child 2 and Child 3 in their cribs for long periods of time as a form of discipline and that Father had harshly punished Child 1 for eating one of her sibling's food. On the same day, DHS obtained an Order for Protective Custody ("OPC") for Child 1. On April 20, 2012, the court issued a Dependency Court Protective Order ("DCPO") restraining Father's contact with Child 1 for one year. On April 23, 2012, DHS obtained an OPC for Child 2 and Child 3. On April 25, 2012, at the Shelter Care Hearing, Children's legal custody was transferred to DHS and the Children were placed with family friends. The Children were adjudicated dependent on June 4, 2012. On October 1, 2012, at the first permanency review hearing, the court ordered Father to continue to have supervised visitation with Child 2 and 3 at the agency, and Father to have supervised visitations with Child 1 at therapist's discretion. On February 5, 2013, child advocate filed a motion for a finding of aggravated circumstances and child abuse for all three children. On February 6, 2013 the permanency review hearing was continued. In the permanency review hearing that took place on May 13, 2013, the court reissued for one-year Father's DCPO restriction in regard to Child 1. On June 19, 2013, the court ordered Father to continue supervised visitation with Child 2 and Child 3, and DHS to arrange Father's supervised visitation with Child 1 at therapist's recommendation. In the

permanency review hearings that took place on February 27, 2014 and March 5, 2014, Father's visitation remained the same. On November 8, 2013, child advocate filed an amended motion for aggravated circumstances.

On July 7, 2014, after disposing of some preliminary matters, the trial court heard Dr. Maria McColgan's expert testimony as part of the evidence presented by child advocate in support of her motion for aggravated circumstances. On the same day, the court reissued the DCPO against Father in regard to Child 1. Accordingly, Father is restricted to have contact with Child 1 until July 7, 2015. Due to the complexity of the case and number of witnesses, the aggravated circumstances trial was done over a period of days. On September 8, 2014, Dr. McColgan continued with her testimony and the trial court heard both Father and DHS investigative worker testimonies. The court maintained Father's visitation as previously ordered. On October 1, 2014, the trial court granted a continuance. On October 15, 2014, family therapist for Child 1 testified that she was aware of the DCPO restricting Father's contact with Child 1. Furthermore, Child 1's therapist testified she does not believe it is in the best interest of the child to have the restricted DCPO lifted. (N.T. 10/15/2014, pg. 128). Consequently, in accordance with the court orders issued on October 1, 2012, May 13, 2013 and July 7, 2014, the court maintained Father's DCPO restriction as to Child 1. On October 15, 2014, child advocate withdrew the motion requesting aggravating circumstances as to Child 1 (N.T.10/15/14, pgs. 12-13). In the middle of the permanency review hearing, Father's counsel requested by oral motion to reopen the record to allow Father's testimony as to the aggravated circumstances. The court denied Father's motion. (N.T. 10/15/14, pg. 45). The October 15, 2014, listing was a special listing in order to complete testimony of the aggravated circumstances trial and permanency review. This date was agreed by the parties for a date and time certain at 2:00 P.M. (N.T. 10/15/14, pgs. 8-10, 34-37). Case was called at 2:00 P.M., but court officer informed judge, that Father was not present, but was on his way. Case was called again at 2:30 P.M. and Father was still not present. Father did not show up until 45 minutes into the permanency hearing. Father's counsel had Father testify on September 8, 2014, and cross-examined all witnesses at all hearings and provided a final argument. (N.T.10/15/14, pgs. 8-10, 34-37). With the DCPO in place for Child 1, it means that Father's visits with Child 1 are suspended. Visits are to resume upon therapist recommendations and court lifting the DCPO. As a continuation of the hearing on October 23, 2014, the court announced its decision finding aggravated circumstances as to Father only, and ordered that no reasonable efforts be made to

preserve the family and reunify the Children with the Father. The court also suspended Father's visitation as to Child 2 but Father's visits with Child 3 remained status quo based on the prior orders as to allow for a convenient time for Child 3's therapist to testify. (N.T. 10/23/14, pgs. 95-96). On November 24, 2014, Father's attorney filed a notice of appeal for the order issued on October 23, 2014.

**Discussion:**

### Appeal Issues As to All three Children

1. The court's refusal to allow Father to testify on the aggravated circumstances issues was a denial of due process and abuse of discretion. Although Father was late in arriving on October 23, 2014 to the four-hour hearing, he had been on time for the previous five listings, when each time the court, having been engaged in numerous matters due to lateness in the day, had continued the matter after several hours of Father and all parties waiting. Furthermore, as the hearing continued three and one-half hours after Father's arrival, and as the court had not yet ruled on the aggravated circumstances, there would have been no prejudice to the parties or judicial economy to allow Father's testimony.

2. Father was denied a fair hearing and due process of law by the juvenile court, limiting his cross-examination of the expert witness by denying him the opportunity to ask hypothetical questions.

Father's first claim on appeal contends that the trial court abused its discretion, refusing to hear Father's testimony on the aggravated circumstances issue. Under Pennsylvania law, it is within the discretion of the court to permit either side to reopen its case to present additional evidence. *Commonwealth v. Mathis*, 463 A.2d 1167, 1171 (Pa. 1983). A denial of such opportunity will not be ordinarily disturbed unless the court abused its discretion. *In re J.E.F.*, 409 A.2d 1165, 1166 (Pa. 1979). Furthermore, under Pa.R.E. 611 (a), Pennsylvania courts have discretionary control over the mode and order in which witnesses are interrogated and evidence presented. The court can (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment.

The record established that Father testified on the aggravated circumstances issue at the September 8, 2014, hearing. The October 15, 2014, listing was a special listing with a date and time certain to continue the previous hearing. Father was present at the previous hearing upon which the October 15, 2014, date was given by the court. Father was well aware of the circumstances. The court officer informed the judge that as of 2:00 P.M. Father still had not arrived. Case was called at 2:30 P.M. Father was still not present, but the court was told he was on his way. Father did not arrive until approximately 45 minutes into the hearing having been started. (N.T. 10/1/14, pgs. 8-10, 34-37). Since Father had already testified on September 8, 2014, and Father's counsel had already cross-examined all witnesses at all the hearings and provided final argument, the court was well within its discretion to deny Father's request to re-open the record to allow additional testimony from Father. The court complied with Pa.R.E. 611 (a) to conduct an expeditious hearing to avoid wasting of time and protect the other witnesses from harassment. Father had been present at previous hearings and was well aware of the difficulty of obtaining court dates and other delays from his own attorney with all witnesses present and ready to proceed. (N.T. 10/1/14, pg. 46) (N.T. 10/1/14, pgs. 5, 7). Furthermore, at the moment in which the court denied re-opening the record, the court had sufficient evidence to reach a decision on Children's aggravated circumstances. Accordingly, Father's testimony would constitute needless cumulative testimony pursuant to Pa. R.E. 403.

Father next issue is that the trial court denied him the opportunity to ask hypothetical questions to child's advocate expert witness in cross-examination. Pennsylvania law requires experts to state the facts or data on which the opinion is based. Pa.R.E.705. In doing so, experts can state the basis of the opinion through hypothetical questions (see explanatory comment to Pa.R.E. 705). At the same time, under Pa.R.E. 611 (a), Pennsylvania courts have discretionary control over the mode and order in which witnesses are interrogated and evidence presented. The court can (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment. Furthermore, under Pennsylvania case law, it is well settled that court's evidentiary rulings on questions are controlled by the sound discretion of the court and those rulings will not be disturbed unless a clear abuse of discretion is shown. Abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result

of bias, prejudice, ill-will or partiality, as shown by the evidence or the record. *Ann. M. Phillips v Clark D. Gerhar,* 801 A.2d 568, 572 (Pa. Super. 2002).

At the July 7, 2014, hearing, Father's attorney asked Dr. McColgan: "so a child presenting the same symptoms as Child and also no other systemic causes known, have you ever made a diagnosis of failure to thrive that did not also include neglect?". (N.T. 7/07/14, pg. 58). Child advocate timely objected the question for lack of relevance, arguing that the question did not make reference to the Child. The trial court sustained child's advocate's objection but ordered Father's attorney to rephrase the question. (N.T. 7/07/14, pg. 58). Father's attorney rephrased the question as follows: "Have you ever made a diagnosis of a child for failure to thrive without corresponding diagnosis of neglect, in a case where the child presented the same symptoms as Child, and also did not have any systemic problems?". (N.T. 7/07/14, pg. 59). Child advocate objected for vagueness but the trial court overruled the objection allowing the witness to answer. (N.T. 7/07/14, pg. 59). Again, at the September 8, 2014, hearing, Father's attorney asked the witness: "if you as a doctor, had not had the social history piece which led you to consider abuse and neglect, you hadn't had that but you had all the physical reports and so on, that were at your disposal, could these conditions have been caused by something other than abuse or neglect?". (N.T. 9/08/14, pg. 44). Child advocate timely objected to the question as a compound question. (N.T. 9/08/14, pg. 44). The court sustained and allowed Father's attorney to rephrase her question. (N.T. 9/08/14, pg. 44). Father's attorney did so as follows: "if you had not heard that social history, okay, and yet here you have the same child with the same physical presentations, could those conditions have been caused by something other than abuse or neglect?" Child advocate objected again but the trial court overruled the objection. (N.T. 9/08/14, pg. 45) and the witness answered. (N.T. 9/08/14, pgs. 45-46).

In the same hearing, Father's attorney asked: "Now, assuming for a moment that Child's nutritional problems led to all these injuries, these physical issues which you've reported, and let's assume for the sake of argument that dad's particular way of feeding Child caused them. Is it possible the Father was following a diet for the Children, which was simply inappropriate for that little girl?". (N.T. 9/08/14, pg. 49). The question was timely objected as a compound question and the court sustained the objection. (N.T. 9/08/14, pg. 49). Father's attorney rephrased and the witness expressed that she cannot answer due to the fact that she does not know what type of food Father gave to Child. (N.T. 9/08/14, pg. 50). Father's attorney asked "is it possible that a parent

can give a 2-year-old a diet which would cause Child digestive problems?" The witness, again, answered that she does not know how to answer the question. (N.T. 9/08/14, pg. 52). Child advocate objected, asked and answered. The court sustained the objection (N.T. 9/08/14, pg. 51) because previously the witness testified her lack of knowledge about the type of food Father gave to Child. (N.T. 9/08/14, pg. 50). Father's attorney's next question was "isn't it true that a protein-only diet can kill a person?". (N.T. 9/08/14, pg. 51). The witness answered "yes" but added, "there was no indication that these Children were on a protein diet". (N.T. 9/08/14, pg. 51). Despite expert's answer, Father's attorney claimed she was just asking a hypothetical question. (N.T. 9/08/14, pg. 51). Child's advocate objected, asked and answered, and the court sustained. (N.T. 9/08/14, pg. 51). Finally, Father's attorney asked: "if a child of Child's age did pass a significant amount of beans and rice, would that indicate any particular medical issue to you?". (N.T. 9/08/14, pg. 87). No objection was raised and expert answered the question (N.T. 9/08/14, pg. 86).

As for the examples shown in the above paragraphs, and the other numerous examples throughout the record of hypothetical questions asked by Father's attorney, the objection raised and the rulings of the trial court indicate that the trial court used its discretion pursuant Pa.R.E. 611 (a) to control the mode in which Father's attorney interrogated the witness in cross- examination. In doing so, the record shows that Father's attorney was permitted to ask and rephrase her hypothetical questions. Consequently, Father's attorney had a fair opportunity to cross-exam the expert witness and the issue raised on appeal by Father's attorney is meritless. The court did not abuse its discretion or denied Father a fair hearing and due process of law.

### Appeal Issues As to Child 1

1 Finding aggravated circumstances was improper, as the petitioner did not meet its burden of clear and convincing evidence as to Child 1 since there was no proper petition as to Child 1.

2 Finding that DHS made reasonable efforts was improper, as the petitioner failed to prove the prerequisites finding of aggravated circumstances.

3. The court's continued denial of Father's right to visitation was improper, as the petitioner did not satisfy its burden of showing by clear and convincing evidence that such visits would present a grave threat to the Children.

On the first issue on appeal as to Child 1, Father argues that the trial court abused its discretion, finding the existence of aggravated circumstances as to Child 1, due to the fact that there was no proper petition before the court. Upon reviewing the record, on October 15, 2014, child advocate requested to withdraw her motion for aggravated circumstances as to Child 1 only (N.T. 10/15/14, pg. 12), and the court effectively granted child's advocate motion. (N.T. 10/15/14, pg. 13). Nonetheless, the trial court did find aggravated circumstances as to Father for Child 1. (N.T. 10/15/14, pgs. 3, 6). Consequently, the trial court requests that its decision of finding aggravated circumstances as to Father for Child 1 be vacated since Child 1 was removed from the aggravated circumstances petition by request of the child advocate.

On the second issue on appeal as to this Child, Father argued that without a finding of aggravated circumstances, the trial court should have not found that DHS does not need to make further reasonable efforts. Since the child advocate's motion was granted, the trial court requests that its decision that DHS does not need to make further reasonable efforts to reunify Father with Child 1 be vacated.

On the third issue on appeal as to this Child, Father argued that the court improperly denied his right to visitation, as the petitioner did not satisfy its burden of showing by clear and convincing evidence that such visits would present a grave threat to Child 1. Since at the time of the hearing, the goal was still reunification, a parent may not be denied visitation except where a grave threat to the child can be shown. *In the interest of M.B.*, 449 A.2d 507, 512-513 (Pa. Super. 1996). Visitation has been limited or denied only where the parents have been shown to suffer from severe mental or moral deficiencies that constitute a grave threat to the safety and welfare of the child. *In re C.J.*, 729 A.2d 89, 95 (Pa. Super. 1999). The standard is clear and convincing evidence that a parent is unfit to associate with his or her child. See Id.

A careful review of the record established that Father hit Child 1 with a belt, made Child 1 jump up and down with her hands up (N.T. 9/08/14, pg. 112), chased Child 1 with a knife in his hand and also hit her with an extension cord. (N.T. 10/15/14, pg. 124). Additionally, the record revealed that Father not only restricted Child 1's intake of food, but also subjected Child 1's feedings to reading a specific number of pages. (N.T. 9/08/14, pg. 112). Father's outrageous actions have caused Child 1 post-traumatic stress disorder and extreme fear of her Father. (N.T. 10/15/14, pgs. 123-124). On some occasions Child displayed an aggressive behavior and said to others "You

don't deserve to eat that food. I will call your parents and make sure that they hit you at home". (N.T. 10/15/14, pg. 140). Child's therapist recommended that it is in Child 1's best interest to have no contact with Father. (N.T. 10/15/14, pg. 124). Consequently, Father's heinous and repugnant actions against Child 1 not only posed a grave threat to the child but also clearly showed that Father was unfit to associate with Child 1; therefore, visits had to be suspended. Father constituted a grave threat to the safety, health and welfare of Child 1. The trial court concluded by clear and convincing evidence that Father possessed a moral deficiency. The trial court determined that DHS social worker and Child 1 therapist's testimony were competent and both were credible witnesses. Accordingly, the trial court properly maintained the DCPO, reissued on July 20, 2014, that restricted Father's contact with Child 1 for one year, which means Father's visits are suspended.

## Appeal Issues As to Child 2

1  Finding aggravated circumstances was improper, as the petitioner did not meet its burden of clear and convincing evidence.

2  Finding that DHS made reasonable efforts was improper, as the petitioner failed to prove the prerequisites finding of aggravated circumstances.

3  The court's continued denial of Father's right to visitation was improper, as the petitioner did not satisfy its burden of showing by clear and convincing evidence that such visits would present a grave threat to the Child.

Father's first issue as to Child 2 is that the trial court abused its discretion, finding the existence of aggravated circumstances as to Child 2. Under 42 Pa.C.S. § 6341 (C) (1), the trial court shall determine if aggravated circumstances exist if the county agency or child's attorney alleges the existence of aggravated circumstances and the child is adjudicated dependent. Under 42 Pa.C.S. § 6302 (2), aggravated circumstances exist when the child or another child of the parent has been the victim of physical abuse resulting in serious bodily injury, sexual violence or aggravated physical neglect by the parent. Aggravated physical neglect is defined as any omission in the care of a child, which results in a life-threatening condition or seriously impairs the child's functioning. Pa.C.S. § 6302 (5).

The record established that the Children's inappropriate nutrition was an issue since 2011, when DHS received a report alleging malnutrition of the three Children. (N.T. 9/08/14, pgs. 95, 97,106-107). Children's nutrition remained a serious concern as established by a CPS report alleging malnutrition in April 2012. (N.T. 9/08/14, pgs. 97-98). In fact, Dr. McColgan testified that Child 2's appearance on April 19, 2012, was very thin and cachectic. Child's bones and ribs were visible and she possessed a distended and protruding abdomen. (N.T. 9/08/14, pg. 9). Child's weight was very low (N.T. 9/08/14, pg. 9), less than fifth percentile, which is not typical in a two-year old child, who weighed eight pounds at birth. (N.T. 9/08/14, pg. 9). A cachectic appearance, according to Dr. McColgan, is an appearance that is extremely thin, malnourished and emaciated. (N.T. 9/08/14, pg. 10). Child 2 was also severely constipated (N.T. 9/08/14, pgs. 10, 14). As a result, she was producing hard stools every two to three days. (N.T. 9/08/14, pg. 13). After considering all these symptoms, Dr. McColgan diagnosed Child 2 with failure to thrive. (N.T. 9/08/14, pg. 9). Child 2's failure to thrive and poor nutrition caused liver (hematopoiesis) and spleen enlargement. (N.T. 9/08/14, pgs. 11-12). Child's non-functioning liver was starting to affect her seriously. (N.T. 9/08/14, pg. 21).

Child 2's severe constipation was attributed to poor nutrition. (N.T. 9/08/14, pg. 14). In doing so Dr. McColgan excluded other possible constipation causes and considered that, after receiving appropriate food and Miramax, Child 2 started to stool well. (N.T. 9/08/14, pgs. 12, 14). In reference to Child 2's liver enlargement and stomach distention, Dr. McColgan determined that both were caused by Child 2's failure to thrive and poor nutrition. (N.T. 9/08/14, pg. 12); otherwise, both conditions would not have improved with proper food and Miralax alone, and no treatment. (N.T. 9/08/14, pg. 12). In considering the causes of Child 2's liver enlargement, Dr. McColgan excluded constipation and other possible medical conditions as conceivable causes. (N.T. 9/08/14, pg. 12). Dr. McColgan also concluded that during Child 2's hospitalization and later under foster parents care, her symptoms disappeared with no intervention other than proper nutrition. (N.T. 9/08/14, pgs. 17-18, 24, 26). Moreover, none of the laboratory tests results and medical history indicated other possible causes of Child 2's failure to thrive diagnosis. Consequently, Dr. McColgan attributed the failure to thrive to a long period of neglect (N.T. 9/08/14, pgs. 23, 26-27).

The record established that Father was Children's primary caregiver. Father provided Children's food from Monday to Friday (N.T. 9/08/14, pgs. 83, 114), while Children's mother worked from 7:00 A.M. to 9:00 P.M. Upon mother's arrival from work, the Children were already sleeping. (N.T. 9/08/14, pg. 83). Father also admitted all the decisions concerning Children's feedings were predominantly made by him. (N.T. 9/08/14, pg. 82). Father claimed that his Muslim faith allowed him to place dietary restrictions on the Children. (N.T. 9/08/14, pgs. 97, 111,116). However, Father was withholding food from the Children. (N.T. 7/07/14, pg. 66), threw the food in the trash or put it back in the pot" when mother apportioned it. (N.T. 9/08/14, pg. 111). Father's pattern of conduct led Child 2 to be afraid to eat in front of him. (N.T. 9/08/14, pg. 66). The record further established that Child 2's diet, was very limited for a child of her age (N.T. 9/08/14, pg. 92), and that DHS nurse disqualified the quality and quantity of the food given by Father as "null and void". (N.T. 9/08/14, pg. 112). Throughout the course of DHS investigation, Father never denied giving inappropriate food to the Children. (N.T. 9/08/14, pg. 109).

Father was aware of Child 2's harmful diet. DHS nurse not only disqualified the quality of the food given by Father to the Children as "null and void" (N.T. 9/08/14, pgs. 72, 97, 112), but also emphatically commanded the Father to stop providing Children the wrong food. (N.T. 9/08/14, pg. 96). Additionally, Dr. McColgan's testimony, established that Child 2's medical condition was visible to a person who had daily access to Child. (N.T. 7/07/14, pg. 40-41) (N.T. 9/08/14, pgs. 8, 9). In fact, Father knew that Child 2 had a distended stomach two weeks prior to the date in which mother took the three Children to the doctor. (N.T. 9/08/14, pgs. 64-65). These facts led this court to conclude that Father knew that Child 2's dietary restrictions were harmful to Child 2's health. Nonetheless, Father did not take Child 2 to the doctor. (N.T. 9/08/14, pgs. 85). In fact, it was the mother, and not Father, who took Child 2 to the doctor. (N.T. 9/08/14, pgs. 65,114) (N.T. 7/07/14, pg. 73).

The record established by clear and convincing evidence that Father failed to exercise his duty of care as to Child 2. Father failed to provide for Child 2's safety, health and welfare. Father was aware of the inadequacy of the dietary restriction and its harmful effects in Child 2's health. This was the second time that Father failed to provide for the Children's safety, health and welfare. (N.T. 09/08/14, pgs. 94-99). During the investigation, when Father was asked by DHS investigative worker as to Children's diet, Father answered and repeated several times "I messed

up". (N.T. 09/08/14, pg. 100). Nonetheless, Father maintained Child 2's dietary restriction [was not] causing a serious impairment on Child 2's bodily functions. Moreover, Child 2's medical condition reached the level of a life threating condition as testified by Dr. McColgan. (N.T. 09/08/14, pg. 20). As a result, child advocate met its burden by clear and convincing evidence that aggravated circumstances existed due to Father's abuse of Child 2.

Father's second issue on appeal as to Child 2 is that the court erred in finding that DHS made reasonable efforts for reunification, as the petitioner failed to prove by clear and convincing evidence the existence of aggravated circumstances. Under 42 Pa.C.S. § 6341 (C) (1), if the court determines by clear and convincing evidence that aggravated circumstances exist, the court shall establish whether or not reasonable efforts to prevent or eliminate the need for removing the child from the home or to preserve and reunify the family shall be made or continue to be made. The Pennsylvania Juvenile Act, 42 Pa.C.S.A. §§ 6301-6365, in compliance with the Adoption and Safe Families Act, provides the court with discretion to "determine whether or not reasonable efforts to prevent or eliminate the need for removing the child from the home or to preserve and reunify the family shall be made or continue to be made" when the court finds aggravated circumstances exist. *In the Interest of Lilley*, 719 A.2d 327, 333 (Pa.Super.1998) *In re A.H.*, 763 A.2d 873, 878 (Pa. Super.2008). The focus of the inquiry into whether to terminate efforts to reunify is the best interest of the child, as child's health and safety supersede all other considerations. *In re R.P.*, 957 A.2d 1205, 1220 (Pa.Super.1998).

The record clearly established that Father was Child 2's primary caregiver from Monday to Friday (N.T. 9/08/14, pgs. 83, 114), and only Father decided what Child 2 ate. (N.T. 9/08/14, pg. 82). The initial allegations of Child 2's malnutrition, made in a DHS 2011 report, became a reality in April 2012, when Dr. McColgan diagnosed Child 2's failure to thrive. Despite DHS services, such as a weekly nurse visitation and guidance (N.T. 9/08/14, pgs. 72, 96, 97), Father continued to endanger Child 2's physical and mental development. As established by Dr. McColgan's testimony, Child 2 was diagnosed with failure to thrive. (N.T. 9/08/14, pg. 9). Child 2's bones and ribs were visible and she possessed a distended and protruding abdomen. (N.T. 9/08/14, pg. 9). . Child 2's weight was atypically low for a child of her age (N.T. 9/08/14, pg. 9). Child 2 was also severely constipated. (N.T. 9/08/14, pgs. 10, 13-14). Failure to thrive and poor nutrition also caused an enlargement of her liver and spleen. (N.T. 9/08/14, pgs. 11-12). Child's liver function

was starting to affect her seriously. (N.T. 9/08/14, pg. 21). Child 2's medical condition was visible to Father (N.T. 7/07/14, pg. 40-41) (N.T. 9/08/14, pgs. 8, 9), and Father noticed Child 2's distended stomach before mother took her to the doctor. (N.T. 9/08/14, pgs. 64-65). Nonetheless, Father did not make appropriate adjustments to Child 2's diet nor provide his Child with medical attention. Accordingly, the evidence presented has led this court to conclude that Child 2's health cannot be assured under Father's care. Consequently, it was within the trial court's discretion to order no reasonable efforts to reunify Father and Child 2 be made. It is in the best interest of Child 2's safety, health and welfare.

Father's third issue as to Child 2 on appeal is whether the court denied his right to visitation. Father argued that petitioner did not satisfy its burden of showing by clear and convincing evidence that Father would present a grave threat to the Children. Since at the time of the hearing, the goal was still reunification, a parent may not be denied visitation except where a grave threat to the child can be shown. _In the interest of M.B._, 449 A.2d 507, 512-513 (Pa. Super. 1996). Visitation has been limited or denied only where the parents have been shown to suffer from severe mental or moral deficiencies that constitute a grave threat to the safety and welfare of the child. _In re C.J._, 729 A.2d 89, 95 (Pa. Super. 1999). The standard is clear and convincing evidence that a parent is unfit to associate with his or her child. See Id.

Dr. McColgan attributed Child 2's failure to thrive to neglect (N.T. 9/08/14, pgs. 26-27). After observing that Child 2's precarious physical appearance (N.T. 9/08/14, pg. 9) and symptoms (N.T. 9/08/14, pgs. 10-14) disappeared with no other intervention other than proper nutrition (N.T. 9/08/14, pgs. 17-18, 24, 26), and the laboratory tests results and medical history excluded other possible causes, Dr. McColgan also concluded that Child 2's failure to thrive was the product of long period of nutritional neglect. (N.T. 9/08/14, pg. 23). At the same time, it was established that Father was not only Child 2's primary caregiver (N.T. 9/08/14, pgs. 83, 114), but also determined Child 2's diet. (N.T. 9/08/14, pg. 82). In doing so, Father subjected Child 2 to dietary restrictions, and maintained those restrictions despite being aware of the diet's insufficiency (N.T. 9/08/14, pg. 112) and the harmful consequences on Child 2's health. (N.T. 7/07/14, pg. 40-41) (N.T. 9/08/14, pgs. 8, 9, 64-65). Father unreasonably maintained Child 2's strict diet by actions such as withholding Child 2's food (N.T. 7/07/14, pg. 66), throwing the food in the trash or putting it back in the pot (N.T. 9/08/14, pg. 111) when mother apportioned it (N.T. 9/08/14, pg. 111), leading

Child 2 to be afraid to eat in front of him. (N.T. 9/08/14, pg. 66). Finally, Father failed to provide Child 2 with medical attention. (N.T. 9/08/14, pgs. 64, 85). Child 2's therapist also indicated that the Child 2 is so afraid of Father that during therapy sessions, Child 2 cannot disclose her secrets for fear that Father will kill her with a gun if Child 2 shares what happened with Father during visits. (N.T. 10/23/14, pg. 57). Father minimizes the trauma Child 2 experienced at home. (N.T. 10/23/14, pg. 62). Child 2's therapist recommended that Father visits with Child be suspended at this time. (N.T. 10/23/14, pgs. 62-63). The very fact that Child 2 has continued to have visits with Father the last two years has hindered the Child 2's progress at therapy. (N.T. 10/23/14, pg. 63). Child 2 needs to feel safe both physically and emotionally. (N.T. 10/23/14, pgs. 64-68). Consequently, the trial court concluded that Father's heinous and repugnant actions not only posed a grave threat to Child 2 but also clearly showed that Father was unfit to associate with Child 2; therefore, visits had to be suspended. Father constituted a grave threat to the safety, health and welfare of Child 2. The trial court concluded that Father severe moral deficiencies constituted a grave threat to Child 2. DHS witnesses and Child 2's therapist were competent and credible with their testimony. Accordingly, the trial court did have clear and convincing evidence to suspend Father's visits with Child 2.

## Appeal Issues As to Child 3

1. Finding aggravated circumstances was improper, as the petitioner did not meet its burden of clear and convincing.
2. Finding that the DHS need not to make reasonable efforts was improper, as the petitioner failed to prove the prerequisites finding of aggravated circumstances.
3. The court's continued denial of Father's right to visitation was improper, as the petitioner did not satisfy its burden of showing by clear and convincing evidence that such visits would present a grave threat to the Children.

Father argues that the trial court abused its discretion finding the existence of aggravated circumstances as to Child 3. Accordingly, Father, argued that petitioner did not meet its burden of clear and convincing evidence as to Child 3. Under 42 Pa.C.S. § 6341 (C) (1), if the county agency or child's attorney alleges the existence of aggravated circumstances and the court determines that the child is dependent, the court shall also determine if aggravated circumstances exist.

Additionally, 42 Pa.C.S. § 6302 (2) establishes that aggravated circumstances exist when the child or another child of the parent has been the victim of physical abuse resulting in serious bodily injury, sexual violence or aggravated physical neglect by the parent. Under Pa.C.S. § 6302 (5), aggravated physical neglect is defined as any omission in the care of a child which results in a life-threatening condition or seriously impairs the child's functioning.

The record established that Child 3's malnutrition was a serious concern in two different reports, in 2011 (N.T. 9/08/14, pgs. 95, 97,106-107) and 2012 (N.T. 9/08/14, pgs. 97-98), respectively. Dr. McColgan at SCHC, concluded that Child 3 suffered from severe failure to thrive due to neglect (N.T. 7/07/14, pgs. 33-34, 45) and that Child 3's failure to thrive was probably affecting his height. (N.T. 7/07/14, pg. 45). Child's appearance was very thin and cachectic; his ribs were visible; he did not have a normal aspect for a child of his age; and he had a distended stomach. (N.T. 7/07/14, pgs. 36-37). Child's weight was less than fifth percentile (N.T. 7/07/14, pg. 34) and if his health problems were left untreated it would have become life threatening (N.T. 7/07/14, pgs. 44, 68) with a substantial risk of death. (N.T. 7/07/14, pg. 69). Dr. McColgan ruled out other medical conditions that could have caused Child 3's failure to thrive. (N.T. 7/07/14, pgs. 36, 44). Furthermore, no special medical intervention was required to improve Child 3's condition. A normal diet provided throughout his four days of hospitalization was enough to make him gain about three pounds. (N.T. 7/07/14, pgs. 34, 43, 64-65) (N.T. 9/08/14, pg. 26). Consequently, Dr. McColgan concluded that Child 3's failure to thrive was caused by neglect. (N.T. 7/07/14, pgs. 34, 36, 44). This conclusion has been reinforced by the fact that, under foster parents care, Child 3 gained several pounds. (N.T. 7/07/14, pg. 42-43).

The record established that Father was Child 3's primary caregiver. In fact, Father admitted that Child 3 was under his care until Child's placement in foster care. (N.T. 9/08/14, pg. 75). Father provided Child 3's food from Monday to Friday. (N.T. 9/08/14, pgs. 83, 114). Mother worked from 7:00A.M. to 9:00 P.M., and Child 3 was sleeping when mother returned. (N.T. 9/08/14, pg. 83). Father was in charge of deciding Child 3's diet. (N.T. 9/08/14, pg. 82). In doing so, Father subjected Child 3 to dietary restrictions in compliance with Father Muslim faith. (N.T. 9/08/14, pgs. 97, 111,116). However, Father withheld Child 3's food (N.T. 7/07/14, pg. 66) and threw the food in the trash or put it back in the pot" (N.T. 9/08/14, pg. 111) when mother apportioned it. (N.T. 9/08/14, pg. 111). As a result, Child 3 was afraid to eat in front of his Father. (N.T. 9/08/14,

pg. 66). Throughout the course of DHS investigation, Father never denied giving insufficient food to Child 3. (N.T. 9/08/14, pg. 109).

The record also established that Father was aware of the inadequate diet provided to his Child. A DHS nurse visited the family every week (N.T. 9/08/14, pgs. 72, 97), and opined that the quality and quantity of food given by Father was "null and void" (N.T. 9/08/14, pg. 112). DHS nurse emphatically commanded Father to stop providing Child 3 with the wrong food. (N.T. 9/08/14, pg. 96). Dr. McColgan's testified that Child 3's medical condition was visible to a person that had daily access to the Child. (N.T. 7/07/14, pg. 40-41) (N.T. 9/08/14, pgs. 8, 9). These facts led this court to conclude that Father knew that the Children's dietary restrictions were harmful to Children's health. Nonetheless, Father did not take Child 3 to the doctor. (N.T. 9/08/14, pgs. 65, 114), (N.T. 7/07/14, pg. 73). As a result, the record established by clear and convincing evidence that Father failed to exercise his duty of care as to Child 3. Father failed to provide for Child 3's safety, health and welfare. Father was aware of the inadequacy of the dietary restriction and knew the harmful effects on Child 3's health. Father continue to maintain Child 3's dietary restriction seriously impairing Child 3's bodily functions, almost reaching the level of a life threating condition. As a result, child advocate has met its burden by clear and convincing evidence that aggravated circumstances existed due to Father's abuse of Child 3.

Father also argued that the court erred in finding DHS does not have to make reasonable efforts, as the petitioner failed to prove the prerequisites finding of aggravated circumstances. Under 42 Pa.C.S. § 6341 (C) (1) if the county agency or the child's attorney alleges the existence of aggravated circumstances and the court determines by clear and convincing evidence that aggravated circumstances exist, the court shall determine whether or not reasonable efforts to prevent or eliminate the need for removing the child from the home or to preserve and reunify the family shall be made or continue to be made. The Pennsylvania Juvenile Act, 42 Pa.C.S.A. §§ 6301-6365, complies with the Adoption and Safe Families Act and provides the court with discretion to "determine whether or not reasonable efforts to prevent or eliminate the need for removing the child from the home or to preserve and reunify the family shall be made or continue to be made" when the court finds aggravated circumstances exist. *In the Interest of Lilley,* 719 A.2d 327, 333 (Pa.Super.1998) *In re A.H.,* 763 A.2d 873,878 (Pa. Super.2008). The focus of the inquiry into whether to terminate efforts to reunify is in the best interest of the child. The child's

health and safety supersede all other considerations. *In re R.P.,* 957 A.2d 1205, 1220 (Pa.Super.1998).

The record clearly established that Father was Child 3's primary caregiver (N.T. 9/08/14, pgs. 83, 114), and had the exclusive discretion to decide Child 3's diet. (N.T. 9/08/14, pg. 82). The concerns raised by the initial DHS 2011 report regarding Child's malnutrition worsened in April 2012, when Dr. McColgan diagnosed Child 3's failure to thrive. Despite DHS services, such as a DHS nurse's weekly visitation and guidance on Child 3's diet (N.T. 9/08/14, pgs. 72, 96, 97), Father maintained Child's dietary restrictions, endangering his physical and mental development. Child 3 was diagnosed with a severe failure to thrive, was starting to affect his height. (N.T. 7/07/14, pgs. 33-34, 45). Child's appearance was very thin and cachectic; his ribs were visible; he did not have a normal aspect for a child of his age; and had a distended stomach. (N.T. 7/07/14, pgs. 36-37). The record also established that his weight was less than the fifth percentile. (N.T. 7/07/14, pg. 34). If his condition would have been left untreated, it would become life threatening (N.T. 7/07/14, pgs. 44, 68) with a substantial risk of death. (N.T. 7/07/14, pg. 69). Child 3's medical condition was visible to a person that had daily access to the child. (N.T. 7/07/14, pg. 40-41) (N.T. 9/08/14, pgs. 8, 9). As a consequence, it could not pass unnoticed to Father. Moreover, Father failed to provide Child 3 with medical assistance. Mother took Child 3 and other siblings to the hospital. Accordingly, the evidence presented has led this court to conclude by clear and convincing evidence that Child 3's health cannot be assured under Father's care. Consequently, it was within the trial court discretion to order no reasonable efforts to reunify Father and Child 3 be made. It is in the best interest of Child 3's safety, health and welfare.

Father also argued that the trial court improperly denied Father's right to visitation, as the petitioner did not satisfy its burden of showing by clear and convincing evidence that visits would present a grave threat to Child 3. The trial court, after a general review of the record, verified that Father's visitation as with Child 3 has not been suspended or denied on October 23, 2014. The record clearly established that on October 1, 2012, Father's visitations were supervised at the agency. The trial court maintained Father's supervised visitation at the agency on June 19, 2013, July 7, 2014 (N.T. 7/07/14, pg. 90), and September 8, 2014. In fact, on October 23, 2014, Father's attorney expressly requested to this court "just to be clear, my client asked visits to remain the same with child at this time, correct?" and the court expressly responded that Father visitations remain status quo based

on the court prior orders. (10/23/14, pgs. 95-96). Consequently, Father's appeal of denial of visitation with Child 3 is without any merit.

**Conclusion:**

For the aforementioned reasons, the court finds that child advocate's motion met its statutory burden by clear and convincing evidence regarding Child 2 and Child 3's aggravated circumstances. The court also finds that DHS need not make further reasonable efforts for reunification with Father as to Child 2 and 3. As to child's advocate motion for aggravated circumstances for Child 1, the trial court requested that its decision of aggravated circumstances and no reasonable efforts against Father be vacated.

For the aforementioned reasons, the court finds that the petitioner met its statutory burden by clear and convincing evidence regarding suspension of Father's visitation with Child 1 and Child 2. Father's contact with Child 1 and Child 2 poses a grave threat. Father's visits with Child 3 should remain status quo as previously ordered by the trial court.

Accordingly, the order entered on October 23, 2014, should be affirmed in part and dismissed in part only as to the aggravated circumstances dismissal against Father as to Child 1.

By the court

Joseph Fernandes                    J.

IN THE COURT OF COMMON PLEAS
FOR THE COUNTY OF PHILADELPHIA
FAMILY COURT DIVISION

In Re: K.H.M., A.H.M., J.M.                 CP-51-DP-0000675-2012/0000676-2012/0000669-2012

APPEAL OF: A.F.M., Father                   : 3249, 3250, 3251 EDA 2014

## PROOF OF SERVICE

I hereby certify that this court is serving, today Tuesday, March 24, 2015, the foregoing Opinion, by regular mail, upon the following person(s):

Courtney Norella, Esquire
City of Philadelphia Law Dept.
Office of the City Solicitor
1515 Arch Street, 16th Floor
Philadelphia, Pennsylvania 19102-1595
Attorney for D.H.S.

James Martin, Esquire
1800 JFK Blvd, Suite 300
Philadelphia, PA 19102-1729
Attorney for Mother

Shereen White, Esquire
Defender Association of Philadelphia
Child Advocacy Unit,
1414 Samson Street 4th Floor
Philadelphia, PA 19103
Child Advocate

Maureen F. Pie, Esquire
8 Summit Avenue, Suite 200
Philadelphia, PA 19118
Attorney for Father

BY THE COURT:

Honorable Joseph L. Fernandes